# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MICHAEL SISCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:14-cv-00088 |
| v. | ) | Judge Trauger |
| | ) | |
| NANCY BERRYHILL,[1] | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is the plaintiff's Motion for Judgment on the Administrative Record (Docket Entry No. 15), to which the defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 17). Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 11),[2] and for the reasons given herein, the court finds that the plaintiff's motion for judgment be DENIED and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

The plaintiff, Charles Michael Sisco, filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on June 22, 2011, alleging disability onset as of July 31, 2009, due to diabetes, back and neck problems, high blood pressure, and high cholesterol. (Tr. 92, 196, 203, 261.) The plaintiff's claims were denied at the initial level on September 16, 2011,

---

[1]Nancy Berryhill became acting Commissioner for the Social Security Administration on January 23, 2017, and is therefore substituted as Defendant. *See* Fed. R. Civ. P. 25(d).

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

and on reconsideration on December 9, 2011.  (Tr. 148-150, 154-57.)  The plaintiff subsequently

requested *de novo* review of his case by an administrative law judge ("ALJ").  (Tr. 140-41, 147.)

The ALJ heard the case on April 1, 2013, when the plaintiff appeared with counsel and gave

testimony.  (Tr. 92, 106-137.)   At the conclusion of the hearing, the matter was taken under

advisement until June 17, 2013, when the ALJ issued a written decision finding the plaintiff not

disabled.  (Tr. 89-98.)  That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

2.  The claimant has not engaged in substantial gainful activity since July 31, 2009, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has a combination of impairments, which considered together, is "severe".

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant is 48, which is defined as a younger individual (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2009, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 94-98.)

On August 12, 2014, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1-6), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).

## II.  REVIEW OF THE RECORD

On April 24, 2009, the plaintiff presented to Dr. Tersa L. Lively for a follow-up on chronic pain syndrome and hypertension. (Tr. 460.) The plaintiff reported taking Percocet, which helped for the pain. *Id*. Dr. Lively noted that the plaintiff had a history of arthritis in his knees bilaterally, diabetes mellitus, hypertension, and ruptured discs of the cervical and lumbar spine. *Id*. Dr. Lively noted a history of alcohol use. *Id*. Dr. Lively also noted that the plaintiff was positive for back pain and bone/joint symptoms, but was negative for muscle weakness, myalgias, neck stiffness and rheumatologic manifestations. (Tr. 461.) The plaintiff's blood pressure was 162/102. *Id.* The plaintiff's physical examination revealed that the plaintiff was not in any apparent distress, was well nourished and well developed, and his extremities appeared normal. (Tr. 461-62.) The plaintiff was prescribed Percocet 10mg-325mg one to two tablets every eight hours, Gemfibrozil[3] 600mg one

_____

[3]"Gemfibrozil helps reduce cholesterol and triglycerides (fatty acids) in the blood." https://www.drugs.com/gemfibrozil.html

tablet twice daily, Lisinopril[4] 20mg one tablet daily, Lovastatin[5] 40mg one tablet daily and Novolin 70-30.[6] (Tr. 462.)

On August 21, 2009, the plaintiff returned for a follow-up with Dr. Lively. (Tr. 457.) Dr. Lively noted that the plaintiff's diabetes was stable and that his chronic pain was stable with current dosing and that he "has had no problems." *Id*. The plaintiff's blood pressure was 152/94. (Tr. 458.) On November 20, 2009, the plaintiff returned to see Dr. Lively. (Tr. 454.) As to his chronic pain, the plaintiff reported that he was doing well with his current medications and was not having any issues. *Id*. Dr. Lively prescribed the plaintiff Valium 5mg one tablet, three times daily to treat his anxiety. (Tr. 456.) Dr. Lively continued the plaintiff on his other medications. *Id*.

On June 18, 2010, the plaintiff returned to see Dr. Lively for a follow-up visit concerning neck pain and hypertension. (Tr. 451.) The plaintiff's blood pressure was 152/94. (Tr. 452.) Dr. Lively continued the plaintiff on his current medications. (Tr. 453.) On April 14, 2011, the plaintiff saw Dr. Lively for a follow-up visit. (Tr. 449.) The plaintiff's blood pressure was 144/96. *Id*. The plaintiff's examination results were unremarkable. (Tr. 449-450.)

In his Work Activity Report dated June 24, 2011, the plaintiff reported that he worked 10-15 hours per week, performing odd jobs such as mowing yards, repairing roofs or plumbing, and doing

---

[4]Lisinopril is used to treat hypertension. https://www.drugs.com/lisinopril.html

[5]"Lovastatin reduces levels of 'bad' cholesterol (low-density lipoprotein, or LDL) and triglycerides in the blood, while increasing levels of 'good' cholesterol (high-density lipoprotein, or HDL)." https://www.drugs.com/mtm/lovastatin.html

[6]Novolin 70-30 is a man-made insulin product that is used in the treatment of diabetes. http://www.webmd.com/drugs/2/drug-1468-670/novolin-70-30-vial/details

small construction tasks. (Tr. 242, 244.) The plaintiff stated that he avoided jobs that required heavy lifting. (Tr. 244.)

On August 29, 2011, the plaintiff presented to Dr. Donita Keown for a consultative examination. (Tr. 369.) The plaintiff reported that his neck pain was constant, which radiated into his shoulders, more so on the right than the left, making it difficult for him to use his arms or turn his head. *Id*. The plaintiff reported of pain radiating into the mid thoracic spine and lower back, left buttock and right hip. *Id*. The plaintiff complained that his right leg would go numb at times. *Id*. The plaintiff attended a pain clinic where he received narcotic medications. *Id*. Dr. Keown reported that the plaintiff thought that his neck problems started in 1998 and that his back problems began when he was still working. *Id*. Dr. Keown noted that the plaintiff was "very vague regarding the onset and timing," and that he could not get the plaintiff "to commit to a particular time frame." *Id*. The plaintiff's blood pressure was 116/60, a musculoskeletal examination showed that his range of motion was within normal limits, his cervical spine had a full range of motion, straight leg raises were negative, his strength was graded 5/5 in his left and right hands, arms and legs, and his gait and station were within normal limits. (Tr. 370-71.) Dr. Keown's impression was that he had type 2 diabetes, uncomplicated; chronic spinal complaints likely due to degenerative change with no physical evidence for herniated disc with neural foraminal impingement or stenosis; hypertension treated medically and dyslipidemia treated medically. (Tr. 371.) Dr. Keown essentially opined that the plaintiff could lift 51 to 100 pounds occasionally and 21 to 50 pounds frequently; stand and/or walk up to seven to eight hours in an eight hour workday; sit eight hours in an eight hour workday; that the plaintiff had no limitations as to the use of hands and feet; that the plaintiff could climb

stairs, climb ladders and balance frequently; and that the plaintiff could stoop, kneel, crouch, and crawl frequently.  (Tr. 97, 372-74.)

In a Function Report dated October 7, 2011, the plaintiff reported that he could lift up to twenty pounds.  (Tr. 217.)  On October 10, 2011, the plaintiff was treated by Charles S. Clifton, a certified physician assistant, at Advanced Spine and Pain.  (Tr. 322.)  The plaintiff complained of moderate pain in his lower back and neck.  *Id*.  The plaintiff reported that he did yard work, that he worked, that he watched his granddaughter, and that he exercised daily.  *Id*.  The plaintiff returned on November 8, 2011, complaining of joint pain.  (Tr. 319.)  The plaintiff's physical examination reflected that the plaintiff had tenderness and experienced moderate pain with motion in his cervical and lumbar spine, right shoulder and both knees.  (Tr. 320.)

On November 21, 2011, Stephen Hardison, M. A., a licensed senior psychological examiner, completed a consultative psychological examination of the plaintiff.  (Tr. 343.)  Hardison observed that the plaintiff drove himself to the evaluation, he ambulated independently, he did not have difficulty providing information regarding his background and present situation, his thought content was clear, he did not appear in acute mental health distress, and he was cooperative.  *Id*.  The plaintiff stated that he "[got] along well with people in general."  *Id*.  The plaintiff reported that he had not drank alcohol in almost one year and that he was a heavy drinker in his "younger days," but that he had not drunk heavily since the early 1990's.  *Id*.  The plaintiff, however, reported receiving a DUI two years earlier.  *Id*.

The plaintiff did not have health insurance and received medical care through the health department.  (Tr. 344.)  Hardison noted that the plaintiff suffered from diabetes, back and neck

problems, hypertension, and high cholesterol. *Id.* The plaintiff also reported past incidents where he would "black out," but was not specific as to the cause. *Id.*

The plaintiff did not report any treatment through a mental health clinic. *Id.* The plaintiff was prescribed Valium for anxiety, stating that it kept him calm. *Id.* The plaintiff reported having depressed mood only when he does not get to see his grandchild, stating that the longest he generally goes without seeing her was one week. *Id.* The plaintiff reported "feeling somewhat shaky at times" because of his back problems and that he had issues with being nervous for about two years because of him not having a job. *Id.* The plaintiff denied having significant problems in focusing or concentrating. *Id.*

The plaintiff completed high school and reported being in special education for English. *Id.* The plaintiff's last job was in the summer of 2011 for two weeks, where he poured concrete for a construction company, and stopped working when he "got sick." *Id.* Prior to that, the plaintiff, for approximately two years, worked for himself doing "odds and ends," such as mowing grass and power washing decks and siding for people. *Id.* The plaintiff reported working the previous winter at Wal-Mart, unloading trucks. *Id.* The plaintiff reported that he "got sick and blacked out." *Id.*

As to his daily activities, the plaintiff would occasionally drive to Wal-Mart or to the grocery store, but stated that his mother did most of the grocery shopping. *Id.* The plaintiff periodically visited friends and during the summer, they would "ride around and look for deer." *Id.* The plaintiff performed daily chores, such as vacuuming, washing clothes, and washing dishes and putting them up. *Id.* The plaintiff stated that he cooked two or three days a week. *Id.* The plaintiff also stated that he mowed the grass, would fix anything around the house that needed repairing, and would take walks. *Id.* The plaintiff would occasionally drive his mother to the doctor in Knoxville. (Tr. 345.)

The plaintiff reported that most days he would sit around and watch television or read "old books."
*Id*.

The plaintiff's mental examination revealed an alert individual. *Id*. The plaintiff's thought content was clear. *Id*. Hardison opined that the plaintiff likely functioned in the low average range of intelligence. *Id*.

As to the plaintiff's functional assessment and vocational implications, Hardison opined, as follows:

> This evaluation indicated the ability to remember and carry out simple one-and two-step instructions without significant problems. His ability to remember and carry out somewhat more detailed instructions would not appear more than mildly limited. His ability to sustain concentration and attention in a structured routine job setting would not appear significantly limited. His ability to interact appropriately with co-workers, supervisors, or the general public consistently would not appear significantly limited.
>
> The claimant's ability to respond appropriately to changes in a very structured routine job setting, including being aware of and take appropriate precautions regarding normal hazards would not appear significantly limited. This claimant's ability to make simple job-related decisions would not appear significantly limited. His ability to make more complex job-related decisions could be mildly limited. The degree of disability based on his reported medical-related issues would need assessment by a physician.

(Tr. 345-46.)

On November 29, 2011, Norma Calway-Fagen, Ph. D., completed a Psychiatric Review Technique and marked the box "12.06 Anxiety-Related Disorders" as the category upon which the medical disposition was based. (Tr. 326.) Dr. Calway-Fagen assigned the plaintiff the following limitations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence and pace. (Tr. 336.)

In a follow-up visit with Charles Clifton on December 6, 2011, the plaintiff reported that his pain medications allowed him to be more active. (Tr. 325.) In another follow-up visit with Clifton on February 1, 2012, the plaintiff reported that his pain medications allowed him to take care of his grandchild and to walk outside. (Tr. 317-18.) The plaintiff was continued on Endocet and Percocet for his pain and an in house drug screen was ordered. (Tr. 318.) On April 2, 2012, Clifton noted "pain with range of motion in: neck extension and rotation; back extension and lateral flexion." (Tr. 315.) The plaintiff was continued on his pain medication. *Id.* On May 31, 2012, the plaintiff returned for a follow-up visit with Clifton. (Tr. 628.) The plaintiff stated that "the more he mows the more he hurts" and that "he tries to be as active as he can." (Tr. 629.) The plaintiff was continued on Percocet for his pain. *Id.*

On June 28, 2012, the plaintiff was seen at Cumberland Medical System for altered mental state. (Tr. 279-282.) The plaintiff was reportedly disoriented and had speech problems. (Tr. 301.) Neuropathy and chronic pain were noted. (Tr. 281.) Bilateral carotid ultrasound revealed minimal narrowing of the right and left carotid system. (Tr. 289.) A CT scan of the brain was normal. (Tr. 290.) A chest x-ray showed mild degenerative bone changes, no acute infiltrates, effusions or pneumothoraces, and a normal size heart. (Tr. 291.) The plaintiff's altered mental status was determined resolved, and he was discharged home. (Tr. 303-04.)

On July 18, 2012, the plaintiff received treatment at Volunteer Behavioral Health Care System. (Tr. 523.) As the reasons for seeking treatment, the plaintiff reported that he began experiencing depression approximately three years earlier. *Id.* The plaintiff also reported having anxiety. (Tr. 524.) The plaintiff reported abusing alcohol from 1989 to 2009. *Id.* The plaintiff was assessed with panic disorder without agoraphobia, which was in partial remission because of

medications, and depressive disorder. (Tr. 532.) The plaintiff was assigned a Global Assessment of Functioning Scale ("GAF") of 45[7] and was placed on Prozac 40mg. (Tr. 549.) The plaintiff agreed to start therapy and case management. *Id*. On August 1, 2012, the plaintiff returned and reported that his pain level was a 4 out of 10 on pain medications and that he experienced depression 2 out of 7 days and panic attacks 1 out of 7 days. (Tr. 556.) On August 14, 2012, the plaintiff reported no depression and that he had panic attacks 2 out of 7 days and that his pain rated a 9 out of 10 with pain medications. (Tr. 558.)

On August 27, 2012, the plaintiff returned to Dr. Lively with anxiety. (Tr. 602.) Dr. Lively noted that the plaintiff was oriented and demonstrated "the appropriate mood and affect." (Tr. 603.) Dr. Lively listed Valium 10mg as a medication to be stopped that visit. (Tr. 604.) Dr. Lively also completed a Medical Source Statement on August 27, 2012, and opined that the plaintiff had the following limitations: lifting and/or carrying a maximum of less than ten pounds occasionally and less than ten pounds frequently; standing and/or walking less than two hours in an eight-hour workday; sitting about four hours in an eight-hour workday; occasional kneeling and crouching; and no climbing, balancing, and crawling. (Tr. 564-66.) Pushing and/or pulling was limited in the upper and lower extremities. (Tr. 565.) Dr. Lively opined that the plaintiff would periodically have to alternate sitting and standing to relieve pain or discomfort, explaining that these limitations were due to herniation at L4 and also in the cervical spine and that the plaintiff had nerve damage (neuropathy) that was affected in both the upper and lower extremities. *Id.* Dr. Lively stated that the plaintiff

---

[7]A GAF score of 41-50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed., Text Rev. 2000) (*DSM-IV–TR* ).

would often experience pain severe enough to interfere with attention and concentration. *Id.* Dr. Lively opined that the plaintiff was mentally capable of low stress jobs. *Id.* Reaching and feeling were limited to frequently. *Id.* Environmental restrictions included avoiding concentrated exposure to extreme cold, extreme heat and vibration, and avoiding all exposure to hazards (machinery, heights, etc.). (Tr. 567.)

On August 28, 2012, the plaintiff returned for a follow-up visit with Charles Clifton at Advanced Spine and Pain. (Tr. 631.) The plaintiff was assessed with back pain, visit for current long term use of other drugs, degeneration of lumbar disc and cervical intervertebral disc, neuralgia, neuritis and radiculitis, unspecified. (Tr. 632.) The plaintiff stated that he felt better with the pain medication. *Id.*

On September 12, 2012, the plaintiff returned to Volunteer Behavioral Health Care System. (Tr. 582.) The plaintiff was prescribed Hydroxyzine and Prozac to treat his anxiety. *Id.* The plaintiff stated that he did not have any side effects from his medications. *Id.* The plaintiff's mood was "dysphoric;" his thought process was "organized;" his thought content/perceptions were "normal;" and his sensorium/memory was "impaired memory." (Tr. 582-83.) On September 29, 2012, the plaintiff returned and reported that ha had been looking for work and that he was walking everyday. (Tr. 589.) The plaintiff reported "depression 1/7, anxiety 2/7 days." *Id.* On November 6, 2012, the plaintiff reported that he played with his granddaughter two to three times a week. (Tr. 580-81.) The plaintiff stated that he was struggling to do simple chores, but reported that he was trying to walk each day. (Tr. 581.) The plaintiff reported that he would black out for no reason at times. *Id.*

On January 7, 2013, the plaintiff reported spending time with his family over the holidays, which made him the happiest. (Tr. 651-52.) On January 17, 2013, in a follow-up visit with Charles Clifton, the plaintiff stated that his pain medication "allowed him to fish and have a better life." (Tr. 638.) Records from Volunteer Behavioral Health Care System reflect that on January 29, 2013, the plaintiff reported that he was very stressed about his disability claim, stating that he could not work but would try if it was the only way to keep his home. (Tr. 653-54). On February 15, 2013, the plaintiff spoke by telephone to case manager Brittany Brown at Volunteer Behavioral Health Care System, reporting that he was expelled from the pain clinic he was attending because illegal drugs were found in his system. (Tr. 655.) The plaintiff initially denied using illegal drugs, but later reported it was medication his dentist prescribed him that the pain clinic advised him not to take. (Tr. 655, 658.) On March 12, 2013, the plaintiff reported that he blacked out while driving and totaled his car. (Tr. 660.)

Also, on March 12, 2013, Roy Bilbrey, Ph. D., examined the plaintiff. (Tr. 701.) Dr. Bilbrey noted that the plaintiff drove to the appointment, cooperated well, and was a good historian. *Id.* The plaintiff stated that he graduated from high school with average grades and began working in the construction industry. (Tr. 702.) The plaintiff stated that he was laid off in 2009 and tried to work odd jobs since then. *Id.* The plaintiff reported that he last worked in construction at a prison one and one-half years earlier, but after two weeks of working, he experienced three blackouts and could not return to work. *Id.* The plaintiff stated that he became depressed because of his inability to work and sought treatment at Volunteer Behavioral Health Care. *Id.*

Dr. Bilbrey noted that the plaintiff was alert and oriented and there were no unusual observations concerning his gait or ambulation. *Id.* The plaintiff described his mood as depressed.

*Id.* Dr. Bilbrey noted that there were no indication of any suicidal, homicidal, or paranoid ideation. *Id.* Dr. Bilbrey stated that the plaintiff's memory for remote events is adequate, his concentration abilities appeared adequate, his judgment and reasoning abilities appeared to be good, that he was capable of thinking in abstract terms, and his level of intellectual functioning appeared to be in the average range. *Id.* The plaintiff complained of constant pain in his back, leg and shoulder and of a loss of sensation in his extremities. (Tr. 703.) The plaintiff stated that he had been depressed for one and one-half years and anxious for the past year. *Id.* The plaintiff reported that he performed daily chores, such as vacuuming, cleaning the kitchen, and caring for the dog. *Id.* The plaintiff also mows the yard with a riding mower and trims with a weed eater. *Id.* The plaintiff stated that he watches television, reads the newspaper and visits with relatives who live next door. *Id.* The plaintiff also occasionally visited friends. *Id.* Dr. Bilbrey diagnosed the plaintiff with major depressive disorder, single episode, moderate, and anxiety disorder NOS (Not Otherwise Specified). (Tr. 704.) Dr. Bilbrey assigned the plaintiff a GAF of 60.[8] *Id.*

On March 22, 2013, Dr. Bilbrey completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 705-09.) As to "limitations in mental abilities and aptitudes needed to do unskilled work," Dr. Bilbrey opined that the plaintiff had the following limitations: remembering work-like procedures was slightly limited; understanding and remembering very short and simple instructions was slightly limited; carrying out very short and simple instructions was slightly limited; maintaining attention for two hour segment was moderately limited; maintaining

---

[8]A GAF score of 51-60 reflects moderate symptoms (*e.g.*, flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed., Text Rev. 2000) (*DSM-IV–TR* ).

regular attendance and being punctual within customary, usually strict, tolerances was moderately limited; sustaining an ordinary routine without special supervision was slightly limited; working in coordination with or proximity to others without being unduly distracted was slightly limited; making simple work-related decisions was slightly limited; completing a normal workday and workweek without interruptions from psychologically based symptoms was markedly limited; performing at a consistent pace without an unreasonable number and length of rest periods was moderately limited; asking simple questions or requesting assistance was slightly limited; accepting instructions and responding appropriately to criticism from supervisors was markedly limited; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes was moderately limited; responding appropriately to changes in a routine work setting was slightly limited; dealing with normal work stress was moderately limited; being aware of normal hazards and taking appropriate precautions was slightly limited. (Tr. 706.) Dr. Bilbrey explained that these limitations were due to the plaintiff's depression and anxiety. (Tr. 707.) Dr. Bilbrey also stated that the plaintiff could not deal with stress or criticism and that he was in constant pain. *Id.* As to "limitations in mental abilities and aptitudes needed to do semiskilled and skilled work," Dr. Bilbrey opined as follows: understanding and remembering detailed instructions was moderately limited; carrying out detailed instructions was moderately limited; setting realistic goals or making plans independently of others was slightly limited; dealing with stress of semiskilled and skilled work was markedly limited. *Id.* Dr. Bilbrey explained that the plaintiff's "depression and anxiety would prevent dealing with stress" and that his "constant pain would create irritability." *Id.* As to limitations in mental abilities and aptitudes needed to do particular types of jobs, Dr. Bilbrey opined as follows: interacting appropriately with the general public was slightly limited; maintaining

14

socially appropriate behavior was moderately limited; adhering to basic standards of neatness and cleanliness was slightly limited; traveling in unfamiliar places was slightly limited; and using public transportation was not limited.  (Tr. 708.)

On April 17, 2013, the plaintiff reported to case manager Brittany Brown that he went to the pain clinic near Volunteer Behavioral Health, but the pain clinic denied him pain medication without a letter from his doctor supporting the need for the pain medication.  (Tr. 752.)  The plaintiff stated that he needed the pain medication immediately and was not happy.  *Id*.  The plaintiff later reported that he was unable to obtain pain medication at two pain clinics in Crossville.  (Tr. 754.)  As of April 23, 2013, the plaintiff continued to be diagnosed with panic disorder without agoraphobia, in partial remission due to medications, and depressive disorder, and assigned a GAF of 45.  (Tr. 784-85.)  On May 13, 2013, the plaintiff reported that he was having thoughts of harming himself.  (Tr. 756.)  On July 18, 2013, the plaintiff reported an increase in anxiety and depression.  (Tr. 787.)

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

The determination of disability under the Act is an administrative decision. The only questions before this Court are: (i) whether the decision of the Commissioner is supported by substantial evidence; and (ii) whether the Commissioner made any legal errors in the process of reaching the decision. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

Substantial evidence has been defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller v. Comm'r of Soc. Sec.,* 811 F.3d 825, 833 (6th Cir. 2016) (citation and internal quotation marks omitted).

The Court must examine the entire record to determine if the Commissioner's findings are supported by substantial evidence. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and final determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

## B. Determining Disability at the Administrative Level

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The asserted impairment(s) must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(D); 20 CFR §§ 404.1512(a), (c), 404.1513(d). "Substantial gainful activity" not only includes previous work performed by the claimant, but also, considering the claimant's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which the claimant lives, or whether a specific job vacancy exists, or whether the claimant would be hired if he applied. 42 U.S.C. § 423(d)(2)(A).

In the proceedings before the Social Security Administration, the Commissioner must employ a five-step, sequential evaluation process in considering the issue of the claimant's alleged disability. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must show that he is not engaged in "substantial gainful activity" at the time disability benefits are sought. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007); 20 CFR §§ 404.1520(b), 416.920(b). Second, the claimant must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 F. App'x 83, 85 (6th Cir. 2004). Third, if the claimant has satisfied the first two steps, the claimant is presumed disabled without further inquiry, regardless of age, education or work experience, if the impairment at issue either appears on the regulatory list of impairments that are of sufficient severity as to

prevent any gainful employment or equals a listed impairment. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 CFR §§ 404.1520(d), 416.920(d). A claimant is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability that ends the inquiry. *See Combs, supra; Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

If the claimant's impairment does not render him presumptively disabled, the fourth step evaluates the claimant's residual functional capacity in relationship to his past relevant work. *Combs, supra*. "Residual functional capacity" ("RFC") is defined as "the most [the claimant] can still do despite [his] limitations." 20 CFR § 404.1545(a)(1). In determining a claimant's RFC, for purposes of the analysis required at steps four and five, the ALJ is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir.1988). At the fourth step, the claimant has the burden of proving an inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474. If the claimant cannot satisfy the burden at the fourth step, disability benefits must be denied because the claimant is not disabled. *Combs, supra*.

If a claimant is not presumed disabled but shows that past relevant work cannot be performed, the burden of production shifts at step five to the Commissioner to show that the claimant, in light of the claimant's RFC, age, education, and work experience, can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35

F.3d 1027, 1035 (6th Cir. 1994). In order to rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a claimant can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). Even if the claimant's impairments prevent the claimant from doing past relevant work, if other work exists in significant numbers in the national economy that the claimant can perform, the claimant is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the five-step sequential evaluation process, the claim is not reviewed further. 20 CFR § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a claim at step two of the evaluative process is appropriate in some circumstances).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred (1) by failing to find that the plaintiff has a severe mental impairment and by rejecting the reports of his treating mental providers; (2) by giving little weight to the treating physician opinion of Dr. Tersa Lively; and (3) by failing to call a vocational expert and relying on the Grid at Step 5. (Docket Entry No. 16, at 16-19.) The plaintiff requests that this case be reversed and benefits awarded, or, alternatively, that this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g). *Id*. at 20.

19

Sentence four of 42 U.S.C. § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3). "In cases where there is an adequate record, the [Commissioner's] decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Additionally, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a claimant's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994). The plaintiff's statement of errors is addressed below.

**1. The ALJ erred by failing to find that the plaintiff has a severe mental impairment and by rejecting the reports of his treating mental providers.**

The plaintiff argues that the ALJ erred in finding that his mental impairment was not severe, citing his treatment at Volunteer Behavioral Health Care System that started in July 2012 for depression and anxiety, his GAF of 45 and Dr. Bilbrey's opinion. (Docket Entry No. 16, at 16-17.)

At step two of the sequential evaluation process, a plaintiff bears the burden of showing that a medically determinable impairment is severe and meets the twelve month durational requirement of the Act. *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). A "severe impairment" is "any impairment or combination of impairments which significantly limits [the plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c),

416.920(c).[9]  The Sixth Circuit has described the severity determination as "a *de minimis* hurdle in the disability determination process," in which "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs*, 880 F.2d at 862.  The goal of this test is to screen out groundless claims. *Id*.

Social Security Regulation 96-8p provides:

> The psychiatric review technique described in 20 CFR 404.1520a[10] and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B"[11] and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

1996 WL 374184, at *4 (S.S.A. July 2, 1996).  Title 20 C.F.R. § 404.1520a(d)(1) provides the following:

---

[9]Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting."  20 CFR § 404.1521(b).

[10]Title 20 C.F.R. § 404.1520a(c)(4) provides: "When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme."

[11]"Paragraph B" criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

(d) Use of the technique to evaluate mental impairments. After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1522).

(2) If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

*Id*.

Here, the ALJ determined that the plaintiff's medically determinable mental impairments included anxiety and alcohol abuse, but that, considered singly and in combination, these impairments did not cause more than minimal limitation in the plaintiff's ability to perform basic mental work activities and, thus, were nonsevere. (Tr. 94.) The ALJ explained:

Dr. Hardison only found minimal limitations. (Exhibit 7F). Dr. Bilbrey described only minimal limitations in his narrative report. (Exhibit 29F). He checked some more significant limitations on a form assessment (Exhibit 30F), but those limitations are not given significant weight since they are inconsistent with his own narrative report and the claimant's admitted activity level.

Records from Volunteer Behavioral Health Care System show a brief flare of significant symptoms in July 2012 -through January 2013 (Exhibits 18F, 20F and 28F), but they do not establish that the claimant's mental impairments met the durational requirements of the Act. This is especially true since such symptoms

would preclude even part time work. The claimant admitted that such work has continued.

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has no limitation. He continued to work part time, mows the lawn, and visits family members. The next functional area is social functioning. In this area, the claimant has no limitation on a sustained basis. The third functional area is concentration, persistence or pace. In this area, the claimant has no limitation on a sustained basis. The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(l)).

. . . .

There is nothing in the record supporting a finding that: a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or that he has a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Thus, his impairments do not meet or equal the "B" or "C" criteria of the mental listings. . . .

(Tr. 94-95.)

As noted by the ALJ, "Dr. Bilbrey described only minimal limitations in his narrative report." (Tr. 94.) In a March 12, 2013 evaluation, Dr. Bilbrey noted that there was no indication of any suicidal ideation and that the plaintiff's memory and concentration were adequate and his judgment and reasoning abilities appeared good. (Tr. 702.) The plaintiff's activities of daily living consisted of performing daily chores, such as vacuuming, cleaning the kitchen, and caring for the dog; mowing

the grass; watching television and reading the newspaper; and visiting with relatives and friends. (Tr. 703.)  Dr. Bilbrey also assigned the plaintiff a GAF of 60.  (Tr. 704.)  Despite these findings, on March 22, 2013, Dr. Bilbrey opined that the plaintiff had marked limitations in completing a normal workday and workweek, accepting instructions and responding appropriately to criticism from supervisors, and dealing with stress of semi-skilled and skilled work.  (Tr. 706-07.)  The plaintiff had moderate limitations in maintaining attention, maintaining regular attendance, performing at a consistent pace, getting along with co-workers, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, and maintaining socially appropriate behavior.  (Tr. 706-08.)  The ALJ properly considered Dr. Bilbrey's opinion and gave the minimal limitations in Dr. Bilbrey's narrative report more weight than the more significant limitations he check-marked on a form assessment, explaining that the limitations on the form assessment were inconsistent with Dr. Bilbrey's own narrative report and the plaintiff's admitted activity level.  (Tr. 94, 701-09.)  *See Daniel v. Comm'r of Soc. Sec.*, 527 F. App'x 374, 375 (6th Cir. 2013) (no error where the ALJ provided reasonable explanation in relying more heavily on psychiatrist's "detailed narrative summary" than the psychiatrist's conclusions).

The plaintiff did not start mental health treatment until July 2012, three years after his alleged onset date.  (Tr. 126.)  The ALJ properly considered the plaintiff's mental health treatment records from Volunteer Behavioral Health Care System from July 2012 to January 2013, where the plaintiff showed a flare of significant symptoms, which would have precluded part time work.  (Tr. 95.)  However, the ALJ properly determined that the plaintiff's symptoms did not establish that the plaintiff's mental impairments met the durational requirements of the Act.  *Id.  See Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012) (The plaintiff has "the burden of

showing that he had a severe impairment that met the twelve-month duration requirement."); 42 U.S.C. § 423(d)(1)(A).

As to the plaintiff's GAF score of 45, "the Commissioner 'has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations and internal quotation marks omitted) (alterations in original). A GAF score is "not raw medical data" and does "not necessarily indicate improved symptoms or mental functioning." *Id.* The Sixth Circuit has "explained that a GAF score is 'a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.' A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) (citation omitted); *see also* 65 Fed.Reg. 50746, 50764-65 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings."). An ALJ is "not required to consider . . . GAF scores." *Keeler v. Comm'r of Soc. Sec.*, 511 F. App'x 472, 474 (6th Cir. 2013); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.").[12]

The ALJ did not specifically consider the plaintiff's GAF scores. Instead the ALJ relied upon the medical record and the plaintiff's activity level, social functioning and lack of a limitation on a

---

[12]The court notes that the most recent (5th) edition of the *Diagnostic and Statistical Manual of Mental Disorders* does not include the GAF scale. *Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 650 n.3 (S.D. Ohio 2015); *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (*DSM-V*).

sustained basis in the area of concentration, persistence or pace. (Tr. 94-95.) The ALJ determined that the plaintiff had a flare of significant symptoms from July 2012 through January 2013, but that the flare did not last for 12 continuous months. (Tr. 95.) Based upon the record, the court concludes that the ALJ' conclusions are supported by substantial evidence.

**2. The ALJ erred by giving little weight to the treating physician opinion of Dr. Tersa Lively.**

The plaintiff asserts that Dr. Lively treated the plaintiff over a significant period of time, that Dr. Lively's opinion is sufficiently supported by medical findings and that ALJ erred in giving little weight to Dr. Lively's opinion. (Docket Entry No. 16, at 18.)

Social Security regulations address three classifications of medical sources: treating sources; examining but non-treating sources; and non-examining sources. 20 C.F.R. §§ 404.1527, 416.927; 20 C.F.R. §§ 404.1502, 416.902. A treating source has a history of medical treatment and an ongoing treatment relationship with the plaintiff consistent with accepted medical practice. 20 C.F.R. §§ 404.1502, 416.902. An examining non-treating source has examined the plaintiff, but does not have an ongoing treatment relationship. *Id*. A non-examining source is a physician, psychologist, or other acceptable medical source who has not examined the plaintiff, but provides a medical or other opinion based upon medical and treatment records. *Id*.

The opinion of an examining non-treating source is given greater weight than that from a non-examining source and an opinion from a treating source is afforded greater weight than an examining non-treating source. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (2)). "A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion. The treating physician's opinion must be supported by sufficient medical data. *Jones*, 336 F.3d at 477 (citation omitted).

26

Thus, "[t]reating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). "Moreover, when the physician is a specialist with respect to the medical condition at issue," the specialist's "opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527([c])(5)).

"If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection." *Jones*, 336 F.3d at 477. The regulations provide that an ALJ must provide "good reasons" for discounting the weight of a treating source opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley*, 581 F.3d at 406-07 (6th Cir. 2009) (quoting SSR 96–2p, 1996 WL 374188, at *5). The Sixth Circuit has explained that "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. If the ALJ does not accord the treating physician's opinion "controlling weight," then the ALJ must weigh the opinion based on a number of factors, including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with

the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406.

"However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242 (citing SSR 96-2p, 1996 WL 374188, at *4).

The ALJ found that the limitations Dr. Lively assigned to the plaintiff were inconsistent with the plaintiff's "admitted activity level" and that the limitations were "given little weight," except to the extent they were consistent with a finding that the plaintiff was limited to light exertion. (Tr. 97.) The plaintiff's "admitted activity level" included being able to lift up to twenty pounds, performing light and medium work on a part-time basis, such as mowing yards, repairing roofs or plumbing, power-washing decks, and doing dock work as a laborer. (Tr. 217, 242, 248, 276, 344.) The ALJ noted that there were "no contrary opinions from any of the other treating or examining sources." *Id.* The ALJ earlier stated:

> The severity of the claimant's subjective findings far exceed what would reasonably be expected in light of the objective findings. His claims of "blackouts" are not documented in the medical evidence, other than alcohol-related incidents prior to his alleged onset date. As discussed above, his complaints of mental limitations are only documented for a brief period that does not meet the durational requirements of the Act. There is objective evidence of arthritis and degenerative disc disease, but the objective findings do not appear to have significantly worsened since before he stopped engaging in substantial gainful activity in 2009. If his complaints were fully credible, they would have precluded even part time work activity and more than sedentary exertion. He admitted engaging in at least light or medium exertion in performing odd jobs and his work on a loading dock. For these reasons, the claimant's complaints are found credible only to the extent they would limit him to light exertion.

(Tr. 96.) Also, in giving no weight to the opinion of Dr. Keown, the consultative examiner, that the plaintiff would be capable of heavy exertion, the ALJ properly considered the medical evidence and

concluded that Dr. Keown's opinion ignored the objective findings of degenerative disc disease, arthritis and diabetes mellitus. (Tr. 97.)

Accordingly, the court concludes that the ALJ considered Dr. Lively's opinion along with the medical record as a whole and properly concluded that Dr. Lively's limitations were inconsistent with the plaintiff's admitted work activity and therefore this statement of error is without merit.

## 3. The ALJ erred by failing to call a vocational expert and relying on the Grid at Step 5.

The plaintiff argues that the ALJ erred by failing to call a vocational expert at step five of the sequential evaluation and instead improperly relied on the Medical-Vocational Guidelines, known as the "grids." (Docket Entry No. 16, at 18.) The plaintiff contends that he suffers from a non-exertional impairment caused by pain that prevents the application of the grids. *Id.* at 19.

At the fifth step of the evaluation process, the Commissioner has the burden of proving the availability of jobs in the national economy that the claimant is capable of performing, although the burden remains upon the claimant to prove his lack of residual functional capacity. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). "An ALJ can use Medical-Vocational guidelines or 'grids,' found at 20 C.F.R. Part 404, Subpart P, Appendix 2, at the fifth step of the disability determination after the claimant has been found not to meet the requirements of a listed impairment, but found nevertheless incapable of performing past relevant work." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010). "[T] he grids are a shortcut that eliminate the need for calling in vocational experts." *Hurt v. Sec'y of Health & Human Servs.*, 816 F.2d 1141, 1142 (6th Cir.1987). "Normally, where a claimant suffers from an impairment limiting only his strength (i.e., exertional limitations), the SSA can satisfy its burden through reference to the grids. The grids,

in conjunction with the claimant's RFC, age, education and work experience, are used to determine whether the claimant can successfully adjust to other work." *Kyle*, 609 F.3d at 855.

The Sixth Circuit has held:

> [T]he SSA may not rely on the grids alone to meet its step-five burden where the evidence shows that a claimant has nonexertional impairments that preclude the performance of a full range of work at a given level. Normally, where a claimant suffers from an impairment limiting only her strength (i.e., exertional limitations), the SSA can satisfy its burden through reference to the grids without considering direct evidence of the availability of jobs that the particular claimant can perform.

*Id*. at 424 (citations omitted). "Where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness; manipulative restrictions; or heightened sensitivity to environmental contaminants, rote application of the grid is inappropriate." *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990) (citations omitted). "A mental impairment must produce work-related limitations that significantly affect the claimant's ability to perform a full range of work at a given exertional level before a mental impairment precludes the use of the medical-vocational guidelines." *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). "A mere allegation of a nonexertional limitation is not sufficient to preclude application of the grid; the determining factor is whether the alleged nonexertional impairment is severe enough to alter the conclusion that the claimant could do a full range of [work at the designated level.]" *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 772 (6th Cir. 1987); *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009) ("'[B]efore reaching the conclusion that the grid will not be applied because [of the alleged] nonexertional limitations, those limitations must be severe enough to restrict a full range of gainful employment at the designated level.'") (citation omitted); *Miller v. Comm'r of Soc. Sec.*, 76 F.3d

379, 1996 WL 33219, at *1 (6th Cir. Jan. 26, 1996) ("A claimant must show that the non-exertional impairment is severe enough to restrict a claimant's ability to perform a full range of sedentary, light, or medium work."); *Enyart v. Colvin*, No. CV 15-87-ART, 2016 WL 8199739, at *3 (E.D. Ky. May 16, 2016) ("So, contrary to [the plaintiff's] assertion, an ALJ may rely only on the grids if the claimant has both exertional and nonexertional limitations. To do so, however, the ALJ must find that the nonexertional limitations do not significantly limit the claimant's exertional range of work.").

"[W]ith reference to pain as a non-exertional limitation, the ALJ is not precluded from using the Guidelines unless the alleged pain is severe enough to restrict a full range of work at a particular exertional level." *Carreon v. Massanari*, 51 F. App'x 571, 575-76 (6th Cir. 2002); *Thoroughman v. Chater*, 91 F.3d 144, 1996 WL 316518, at *1 (6th Cir. June 10, 1996) ("[P]ain is not a nonexertional impairment which prevents the use of the guidelines."). "Pain can be disabling, but only if it is found to be a credible claim and if it establishes an inability to be gainfully employed." *Cole*, 820 F.2d at 772; *Marcano v. Secretary*, 812 F.2d 1407, 1987 WL 36559, at *5 (6th Cir. Jan. 5, 1987) ("[W]e do not consider pain alone to be a nonexertional limitation that defeats the application of the grid. A nonexertional limitation must be severe enough to restrict a full range of gainful employment at the designated level.") (citations omitted).

A claimant's "statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ." 42 U.S.C. § 423(d)(5)(A). The Sixth Circuit has stated:

> To support a claim for disability there must be objective medical evidence in the record of an underlying medical condition. If this requirement is met, the court must also determine either that the objective medical evidence confirms the severity of the alleged disabling pain arising from the condition, or that the objectively established medical condition is of such a severity that it can reasonably be expected to produce

> disabling pain. In applying this standard the reviewing court should show deference
> to the decision of the administrative law judge in assessing credibility.

*Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1030 (6th Cir. 1990) (citations omitted).

"In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417 (6th Cir. 2011) (quoting SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)). "Social Security Ruling 96-7p . . . requires the ALJ explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers*, 486 F.3d at 248. An ALJ "is not required to analyze the relevance of each piece of evidence individually. Instead, the regulations state that the decision must contain only 'the findings of facts and the reasons for the decision.'" *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011) (quoting 20 C.F.R. § 404.953); *see Loral Def. Sys.-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as" the ALJ's treatment of the evidence as a whole shows that the ALJ "implicitly resolve[d] such conflicts.") (citations and internal quotation marks omitted); *accord Bowman v. Chater*, No. 96–3990, 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997). If an ALJ "simply erred in a factual finding," courts "are not to second-guess," "[a]s long as the ALJ cited substantial,

legitimate evidence to support his factual conclusions." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d

709, 714 (6th Cir. 2012). "[H]armless error analysis applies to credibility determinations in the social

security disability context." *Id.*

Title 20 C.F.R. § 404.1529(c)(3) provides:

Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work—

(3) Consideration of other evidence. Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning your functional limitations and
> restrictions due to pain or other symptoms.

*Id.*

"An ALJ, however, is not required to explicitly discuss every § 404.1529(c)(3) factor in [the credibility] assessment." *Ausbrooks v. Astrue*, No. CIV.A. 12-12144, 2013 WL 3367438, at *19 (E.D. Mich. July 5, 2013); *Barney v. Comm'r of Soc. Sec.*, No. 1:08-CV-1225, 2010 WL 1027867, at *2 (W.D. Mich. Mar. 18, 2010) (rejecting the plaintiff's argument that the ALJ should have considered his work history in the disability determination). In weighing the factors in 20 C.F.R. § 404.1529(c)(3), "the Commissioner has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). An ALJ's credibility determination is entitled to great deference. *See Ulman*, 693 F.3d at 714 ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (citation omitted).

In finding that the plaintiff was not disabled, the ALJ applied Medical-Vocational Rule 202.20, where the plaintiff was a "younger individual," whose education was "high school graduate or more" and whose prior work experience was "[u]nskilled or none."[13] (Tr. 98.) As to the plaintiff's RFC, the ALJ found that the plaintiff had "the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)."[14] (Tr. 96.) The ALJ stated:

---

[13]20 C.F.R. § Pt. 404, Subpt. P, App. 2.

[14]Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Jobs are in this category

The severity of the claimant's subjective findings far exceed what would reasonably be expected in light of the objective findings. His claims of "blackouts" are not documented in the medical evidence, other than alcohol-related incidents prior to his alleged onset date. As discussed above, his complaints of mental limitations are only documented for a brief period that does not meet the durational requirements of the Act. There is objective evidence of arthritis and degenerative disc disease, but the objective findings do not appear to have significantly worsened since before he stopped engaging in substantial gainful activity in 2009. If his complaints were fully credible, they would have precluded even part time work activity and more than sedentary exertion. He admitted engaging in at least light or medium exertion in performing odd jobs and his work on a loading dock. For these reasons, the claimant's complaints are found credible only to the extent they would limit him to light exertion.

*Id*.

In discounting Dr. Keown's opinion, the ALJ stated that Dr. Keown ignored "the objective findings of degenerative disc disease, arthritis, and diabetes mellitus" and that her opinion would therefore be given no weight. (Tr. 97.) The ALJ also explained that Dr. Lively's limitations were inconsistent with the plaintiff's admitted activity level and were given little weight, except to the extent they were consistent with light work. *Id*. The ALJ noted that there were "no contrary opinions from any of the other treating or examining sources." *Id*.

Based upon the entire record, the court concludes that the ALJ properly included all credible limitations in the plaintiff's RFC and that substantial evidence supports the ALJ's finding that the plaintiff could perform the full range of light work. Because the application of the grids was appropriate, the testimony of a vocational expert was unnecessary, and there was no error.

## IV. CONCLUSION

when they require a good deal of walking or standing, or when they involve sitting most of the time with some pushing and pulling of arm or leg controls. *Id*. For a claimant to be capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities. *Id*.

For all of the above reasons, the plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) is **DENIED**.  An appropriate Order will accompany this memorandum.

ALETA A. TRAUGER
United States District Judge